**George Allen WALSH, et al.**

v.

**CITY MORTGAGE SERVICES, INC. (Two Cases)**

**Civ. A. Nos. 85–116–A, 85–205–A.**

United States District Court, M.D. Louisiana.

May 31, 1989.

504

Bruce S. Kingsdorf, Carl W. Cleveland, Cleveland, Barrios, Kingsdorf & Casteix, New Orleans, La., for plaintiffs, George Allen Walsh, Thomas A. Brown, Villa Rose Apartment a/k/a Brown, Walsh, Stewart Partnership, The Villa Condominium, Inc.

Terry F. Hessick, Baton Rouge, La., for plaintiff, Terry F. Hessick.

Charles S. McCowan, Jr., John S. Hilbert, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, La., for defendants, City Mortg. Services, Inc., City Federal Sav. & Loan Ass'n.

Vincent P. Fornias, Joseph A. Schittone, Jr., Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, La., for defendant, Hartford Acc. & Indem. Co.

## RULING ON MOTIONS

JOHN V. PARKER, Chief Judge.

In this action, a jury has rendered a verdict in the amount of $2,702,000 in favor of plaintiff, the trustee in bankruptcy for The Villa Condominium, Inc., and against the defendants, City Mortgage Services, Inc. and City Federal Savings & Loan Association. Hartford Accident & Indemnity Company is made a defendant as the alleged liability insurer of the other defendants. CMS and City Federal have filed a cross claim against Hartford which, by stipulation, was submitted to the court for decision. The court has ruled in favor of Hartford on the cross claim.

The jury verdict was predicated upon a loan commitment issued by defendants to Brown and Walsh Partnership, the then owner of the Villa Rose Apartments which were converted to condominiums to be sold as individual units. The loan commitment provided for defendants to make loans to qualified buyers of condominium units in the project. No loans were ever made under that commitment.

The loan commitment is in the form of a letter dated September 12, 1983 from CMS (signed by Thomas L. Johnson, Vice President) addressed to "Brown, Walsh, Stewart Partnership." The commitment obligates CMS (and its parent City Federal) to fund loans in the Villa Rose Condominium project, up to a total amount of four million dollars, terms and conditions of the loans "subject to FNMA requirements and availability of programs." The commitment papers were delivered in Baton Rouge by a relatively low level CMS employee named Charles Lawrence "Rick" Barreca. After the partnership signed approval of the commitment, Barreca signed the "Lender's Acceptance" on behalf of CMS. Barreca also signed on behalf of CMS an amendment to the commitment which materially changed it by providing that loans would be funded "upon a 30% pre-sale of the project;" the amendment also substituted "CMS requirements" for FNMA "approvals and requirements." Apparently no copy of the amendment was furnished to the CMS division office in Bellevue, Washington which authorized the loan commitment. After the loan commitment was issued, the partnership transferred title to the Villa Rose property to The Villa Rose Condominium, Inc., a corporation wholly owned by Brown and Walsh. On February 7, 1984, CMS wrote to plaintiffs declining to comply with the amendment but indicated its willingness to go forward with funding loans under the terms of the original commitment. That arrangement was not acceptable to plaintiffs. No loans were funded by defendants. Plaintiffs filed suit for damages. The original plaintiffs were, Walsh and Brown individually, Villa Rose Apartments Partnership a/k/a Brown, Walsh, Stewart Partnership and The Villa Condominiums, Inc.

The court held that Walsh and Brown individually had no claims to assert and that since the partnership had transferred title to the corporation before the alleged breach of contract, the partnership had no claim to assert. Only the claims of the corporation were submitted to the jury.

On special interrogatories the jury found that Barreca had no actual authority to execute the amendment to the commitment on behalf of the defendants, that he did have apparent authority to do so, that the partnership's reliance upon Barreca's apparent authority was justified, that the cor-

poration, The Villa Condominium, Inc., was capable of meeting the conditions of the commitment, as amended, that the action of defendants declining to comply with the terms of the amendment was an anticipatory breach of contract which excused further performance by plaintiff, that plaintiff did not breach the "anti-assignment" provision of the loan commitment, that action of defendants was a cause in fact of damage to plaintiff and that the damages amounted to $2,702,000.

This matter is before the court upon several motions which present a plethora of issues.

### The Cross Claim

■ Counsel for CMS * notes that the court's ruling of February 16, 1989, failed to address the cross claim made by CMS against Hartford under the theory of unjust enrichment. Counsel is correct; the court overlooked that theory which was asserted by a late filed amended cross claim.

The unjust enrichment theory is based upon the notion that counsel provided by CMS at its own expense assisted counsel provided to the defendants by Hartford in the defense of the action and that thus Hartford became "unjustly enriched" to the extent that CMS pays the fees of the second set of lawyers. The theory is without merit.

The amount claimed in this litigation by the plaintiffs exceeds the policy limits. It is undisputed that Hartford informed CMS that the claim was in excess of policy limits and that Hartford denied coverage except for the claims asserted in the allegations made in paragraph 40(g) of the complaint (damage to credit reputation, etc.). It is stipulated in the pretrial order that, "Hartford's appointed counsel has at all times defended City Mortgage and City Federal against all claims asserted in these proceedings; ..."

The fact that CMS decided to secure its own counsel to represent it relative to coverage questions and because of the excess claims made over policy limits can in no way amount to an "unjust enrichment" to Hartford.

Accordingly, the cross claim upon the theory of unjust enrichment is hereby rejected and there will be judgment in favor of Hartford on the cross claim.

### Plaintiff's Motion to Alter or Amend the Judgment

Plaintiff, the trustee for The Villa Condominium, Inc., moves the court to amend the judgment to reflect the current correct name of the defendant, City Mortgage Services, Inc. (now known as CityFed Mortgage Company), and to enter judgment against defendant, City Federal Savings & Loan Association (now known as City Federal Savings Bank).

■ Defendants do not oppose the amendment to reflect the name change but they do oppose any amendment to the judgment to add City Federal Savings & Loan Association. The defendants now argue that the bank was not a party to the contract and that the jury interrogatories referred only to liability of CMS.

Plaintiff correctly points out that for reasons of simplicity the jury interrogatories made reference only to CMS. At no time before the filing of this post-trial motion have the defendants objected to the presence of City Federal Savings & Loan Association as a defendant in this case. The contract itself defines "lender" as "City Mortgage Services, Inc. or its parent company, City Federal Savings & Loan Association." Thus, the parent was included in the contract, at the option of the defendants, throughout the relationship between the parties.

Accordingly, the motion to alter or amend the judgment is hereby GRANTED and the judgment will be rendered against CityFed Mortgage Company and City Federal Savings Bank, in solido.

### Motion of Defendants for Judgment Notwithstanding the Verdict

The defendants move the court for judgment notwithstanding the verdict predicat-

* As used herein, "CMS" includes both defendants, City Mortgage Services, Inc. and its parent, City Federal Savings & Loan Association unless the contrary is clear from the text.

ed on the notion that the court erred in failing to dismiss the breach of contract claims on behalf of the corporation on motion for directed verdict. Defendants argue that the forward commitment contract was between CMS and the partnership and that any attempt to assign the contract was invalid as a matter of Louisiana law.

■ The standard for judgment NOV is the same as the standard for granting a motion for directed verdict. 9 C. Wright & A. Miller, Federal Practice and Procedure, § 2537 (1971). This standard was examined by the Fifth Circuit in *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir. 1969), where the court stated:

> "On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions shall be denied ..."

*Id.* at 374.

■ The defendants contend that the court erred in allowing the assignment question to go to the jury. The loan commitment contained a clause entitled "NON–ASSIGNABILITY" which reads in part:

> This letter of commitment is not assignable in whole or in part by Developer without written approval by Lender. The sale or transfer of a partnership interest of Developer shall constitute an assignment within the meaning hereof.

At trial the court held that, as a matter of law, the clause did not prohibit all assignments, but rather, the intent was to insure lender approval of any such assignment.[1]

As noted earlier, Brown and Walsh were the sole shareholders of the corporate owner of the project and, after the transfer of title, the same sales staff continued to deal with CMS. The evidence showed that CMS sent people to Baton Rouge from its Houston office on several occasions to handle loan applications and other business with the "Brown–Walsh interests." By early February 1984, the sales staff had procured a number of purchase agreements on units to be sold which were tendered to CMS. Although no evidence of any written assignment of the loan commitment from the partnership to the corporation was offered, plaintiff produced evidence that the name Villa Condominium, Inc. appeared on all of the purchase agreements, that CMS was aware that the property had been transferred from the partnership to the corporation and that Walsh and Brown were the sole shareholders of the corporation. There was also evidence from which a reasonable jury could conclude that a de facto assignment had taken place because both sides continued to perform under the loan commitment after the transfer of the property from the partnership to the corporation. The jury found, in response to an interrogatory that plaintiff did not breach the anti-assignment clause.[2]

1. The court instructed the jury as a matter of law, "that the [anti-assignment] provision does not prohibit all assignments. Its purpose was to give CMS the opportunity to review the background and experience of any person to whom such an assignment might be made." See court's instruction to the jury at 17A.

2. Although the defense complains at length about the submission to the jury and the wording of interrogatory No. 7 (with benefit of hindsight, the court agrees that it could be significantly improved), the court notes that interrog-

atory No. 7 is a verbatim copy of proposed jury interrogatory No. 6 submitted by the defense. If interrogatory No. 7 was misleading or otherwise objectionable, it was because of the drafting efforts of the defense. Moreover, the record will show that no objection was made to the submission of interrogatory No. 7. The defense did object to the court's failure to give defense requested instruction No. 44 which includes the statement, "A strictly personal obligation is, by its nature and by law, *not* assignable." The court refused to give that instruction because

The defense argues that whatever the motivation for the sale of the property itself by the partnership to the corporation, the sale was a real, substantive transfer of ownership with legal consequences. One such legal consequence advanced by the defense is that there was no loan commitment to the corporation. The jury found that the anti-assignment clause was not violated. Implicit in that finding is that CMS had no objection to funding loans produced by the corporation, and the finding of the jury is amply supported by the evidence presented.

■ The defense also urges the court to grant a judgment notwithstanding the verdict on the basis that the evidence does not support a finding that the actions of CMS were the cause of plaintiff's damages and on the basis that the damage award is grossly excessive.[3] Both sides presented substantial evidence on the issue of damages and causation. The jury chose to believe the evidence presented by plaintiff that the failure of the defendants to fund sales of units at the Villa Rose Condominiums was the cause of damages sustained by the plaintiff. It cannot be said that a reasonable jury could not have possibly found that the evidence supported plaintiff's claims as to causation. The defense had ample opportunity to rebut plaintiff's evidence throughout the course of the trial. The fact that the defendant failed to convince the jury that plaintiff's damages were not caused by CMS's failure to fund the loans does not provide a sufficient basis for a judgment notwithstanding the verdict. That motion is hereby DENIED.

the court ruled that as a matter of law the contract at issue here was assignable but required the approval of the lender. The jury found that there was no violation of the anti-assignment clause.

3. There is some doubt as to whether excessive verdict is appropriate for consideration on a motion for judgment notwithstanding the verdict. Under the Federal Rules of Civil Procedure, "[a] motion for judgment notwithstanding the verdict, like a motion for directed verdict, must state the grounds on which it is made. Since it is technically only a renewal of the

**Motion of Defendants for a New Trial**

A trial court may grant a new trial under Fed.R.Civ.P. 59, "based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir.1985). "The decision to grant or deny a motion for new trial generally is within the sound discretion of the trial court and will not be disturbed unless there is an abuse of that discretion or misapprehension of the law." *Keeler v. Richards Manufacturing Co., Inc.*, 817 F.2d 1197, 1200 (5th Cir.1987), quoting, *Dixon v. International Harvester Co.*, 754 F.2d 573, 586 (5th Cir.1985).

Rule 59 does not state specific grounds for the granting of a new trial, but rather, provides that new trials may be granted for any reason for which they have historically been granted. *Transworld*, 773 F.2d at 613. In making its determination on a motion for new trial, the court may weigh all of the evidence, but need not view it in a light most favorable to the non-moving party. *Id.*

1. **Jury Instructions**

■ Here the defense generally repeats the arguments made in the motion for judgment notwithstanding the verdict and also argues that the court's failure to give defendants' requested jury instruction No. 44 constitutes prejudicial error and warrants the granting of a new trial. That requested instruction reads as follows:

Rights and obligations arising from a contract are heritable and assignable unless the law, the terms of the contract or its nature preclude such effects.

motion for directed verdict made at the close of the evidence, it cannot assert a ground that is not included in a motion for directed verdict." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2537 (1971); see, *Dimmitt Agri Industries, Inc. v. CPC International, Inc.*, 679 F.2d 516, 521 (5th Cir.1982), cert. denied, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1976). Since the amount of the verdict could not be known until after the jury returned its verdict, it is apparent that the motion for directed verdict was not based on an excessive award.

Paragraph XIV of the Original Forward Commitment provides:

'This letter or commitment is personal between the lender and developer and is not intended to benefit any third party incidentally or otherwise.'

A strictly personal obligation is, by its nature and by law, not assignable.

As noted in the discussion above, this court found that as a matter of law, the anti-assignment clause in this contract did not prohibit assignments but rather, was intended to give CMS an opportunity· to review the background and experience of potential assignees. The proposed jury charge of the defense omits the title of paragraph XIV which is, "NO THIRD PARTY BENEFICIARIES." The purpose of paragraph XIV was not to convert an otherwise assignable contract into a non-assignable contract but to specify that there was no intent that the contract be considered as a stipulation pour autrui (in favor of third party beneficiaries). The court held that this contract was assignable, subject to approval by the lender and the jury found that the anti-assignment clause was not violated. If the court is wrong on the law, then obviously failure to give the requested instruction and the instruction which was given by the court, constitute error. The defense has not presented any convincing argument that the court's instruction to the jury was in error.

### 2. The Finding of Apparent Authority

██ The defense also argues that the jury finding that Rick Barecca had apparent authority to bind the defendants was against the weight of the evidence and warrants the granting of a new trial. The court instructed the jury that apparent authority requires the existence of two essential elements: "First, the principal has acted in such a manner as to give an innocent third person the reasonable belief that the agent has certain authority to act for the principal. Second, the third person reasonably relied on this action." See, court's instruction No. 13; see, *Boulos v. Morrison*, 503 So.2d 1, 3 (La.1987). It cannot be said that the jury's finding of apparent

authority was against the weight of the evidence. The evidence clearly shows that Barreca worked for the defendant, CMS, not Brown and Walsh and that he was the agent whom CMS sent to negotiate with Brown and Walsh.

### 3. Causation

Defendants also strenuously argue again, that the evidence does not support the finding that any action of the defendants caused damage to the plaintiffs. They suggest that the damages were caused by plaintiff's voluntary abandonment of the marketing effort and by the downturn in Louisiana's economy. Unfortunately for the defense, the jury chose to conclude otherwise and there is evidence which supports the jury's finding that it was the failure to fund loans on the basis upon which Barreca agreed that caused damage to plaintiff.

### 4. Excessive Damages

A more serious issue is presented on the question of excessive damages.

In Louisiana contract cases, "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." La.Civ.Code art. 1995.

Plaintiff in this case went to the jury upon a theory of lost profits on the sales of condominium units which it claimed it could have made had the defendants fulfilled the commitment to fund loans, together with certain expenses plaintiff claimed it incurred because of the breach. In closing argument, counsel for the plaintiff claimed $2,151,500 in lost profits plus expenses of $652,500 or a total of $2,804,000. The jury verdict was almost exactly the amount counsel for plaintiff demanded—$2,702,000.

██ The evidence of lost profits consisted almost exclusively of a projection contained in Exhibit P–12 which predicted a complete sell-out of all 152 units in the Villa Rose Condominium project within a period of 17 months and showed an estimated net profit in the amount of $1,548,-000 after estimated expenses. In closing argument, counsel for plaintiff relied upon

the gross sales figures depicted in Exhibit P-12 but changed the anticipated expenses, reducing them significantly and from that, argued to the jury that the exhibit showed "lost net profits" of $2,151,500. Counsel for the plaintiff then added to the "net profit" figure certain "fixed costs" [4] which he claimed had been incurred. Counsel for defendants correctly points out that except for the amount paid to Ambank (shown on Exhibit P-98), no evidence of these "fixed costs" was actually produced.

Despite the suggestion by counsel for plaintiff to the contrary, the evidence established beyond the shadow of a doubt that Exhibit P-12 was prepared by Mr. Tanner, the agent of the Brown and Walsh partnership, based upon information provided to him by Brown and Walsh. The projection was clearly "a piece of puff" or best case scenario submitted with the loan application by Brown and Walsh partnership and was intended to convince the prospective lender to make the loan commitment. As such, the "projection" amounts to nothing more than plaintiff's own estimate of lost profits and it thus is clearly inadmissible as evidence to establish the amount of lost profits. See, *Autrey v. Williams and Dunlap*, 343 F.2d 730, 742 (5th Cir.1965). ("In cases where damages are claimed for having been deprived of profits, the contemplated profit must be proved to be reasonably certain and not merely conjectural or speculative ..., or an estimate ..."); *F & F Transfer, Inc. v. Tardo*, 425 So.2d 874, 876 (La.App. 4th Cir.1983) ("A claim for loss of profits will not be supported by mere estimates of loss ... This is especially true in those cases in which corroborative evidence is shown to be available and is not produced ...")

Counsel for the defense also correctly points out that the evidence clearly establishes that 62 of the units were actually sold by the plaintiff corporation after the breach of contract by defendants and that the jury verdict includes estimated "lost profits" on those 62 sold units, as well as

the remaining 90 units which the corporation presumably continued to own. There was testimony that the corporation eventually went into bankruptcy but there is no evidence as to what happened to the remaining 90 units.

The Louisiana Supreme Court has long ago spoken on the subject of lost profit. In *Hall v. Arkansas–Louisiana Gas Co.*, 368 So.2d 984 (La.1979), the court commented:

> Actual damages arising from a breach of contract must be proven; they cannot be merely speculative or conjectural ... It must appear reasonably certain that the amount of damages rests upon a certain basis ... Such proof need be only by a preponderance of the evidence; proof by direct or circumstantial evidence is sufficient to constitute a preponderance when, taking the evidence as a whole, such proof shows that the facts or causation sought to be proved is more probable than not ... The sufficiency of proof of damages must be determined in relation to the particular contract at issue and the circumstances surrounding its breach ... (citations omitted)

368 So.2d at 991.

If plaintiff intends to claim lost profits rather than "the loss sustained" (C.C. art. 1995 supra) then plaintiff must produce evidence that "the amount of damages rests upon a certain basis." *id.* See also *Rabon v. Redball Motor Freight, Inc.*, 292 So.2d 332 (La.App. 2d Cir.1974).

The court must conclude that plaintiff's evidence as to the amount of damages has failed. Plaintiff has used inadmissible evidence to claim damages.

▉ Defendants move for a new trial, at least on the issue of damages. The problem presented to the court is that at no point in the trial of this matter did the defense object to the admissibility of Exhibit P-12 and at no point did the defense object to the use made of the exhibit by counsel for plaintiff. For example, there

---

4. The "fixed costs" were:

| | |
|---|---|
| $100,000 | to Ambank |
| 192,000 | in points |
| $300,000 | interest on $3.5 million for 9 months |
| 60.000 | brokerage fees |
| $652,500 | |

was no objection when Mr. Brown was allowed to testify on direct examination, at the time the exhibit was offered, that the "projection" represented a reasonable estimate of lost profits on the Villa Rose Condominium project. Even in closing argument, when counsel for plaintiff waved the exhibit at the jury, there was no objection forthcoming. Counsel for the defense did not even address the question of the amount of damages in closing argument. Consequently, when the jury reached a verdict on liability, the only damage figure which had been presented to it was the $2,804,000 urged by counsel for plaintiff. Counsel for the defendants now bitterly complains that the evidence on damages was insufficient to support a verdict as a matter of law. Alternatively, the defendants move for a remittitur. There is no evidence upon which the court could fashion a remittitur.

Ordinarily an objection must be the foundation for relief during or after a trial. Had timely objection been made here, for example, the court could have excluded the "projection" in Exhibit P–12 entirely or could have cautioned the jury that it could not base a verdict as to lost profits on that exhibit. Had an objection been made to the manner in which the "projection" was utilized during closing argument by counsel for plaintiff, the court could have taken corrective action at that time. The court is now faced with what is clearly an excessive verdict based upon inadmissible evidence to which no timely objection was made.

It is well established that, "[f]ailure to object may make incompetent evidence competent, but it cannot make irrelevant evidence relevant." *Hirsch v. Immigration and Naturalization Service*, 308 F.2d 562, 567 (1st Cir.1962). This position is in keeping with the positions set forth by both McCormick and Weinstein.

In his treatise on evidence, McCormick states that,

If the evidence is received without objection, it becomes part of the evidence in the case, and is usable as proof to the extent of the rational persuasive power it may have. The fact that it was inadmissible does not prevent its use as proof so far as it has probative value.... Relevancy and probative worth, however, stand on a different footing. If the evidence has no probative force, or insufficient probative value to sustain the proposition for which it is offered, the want of objection adds nothing to its worth and it will not support a finding.

McCormick on Evidence, § 54 at 140–41 (3d ed. 1984).

Similarly, Weinstein states that "a court may not rely on irrelevant evidence to support a verdict despite the fact that it was received without objection." 1 J. Weinstein & M. Berger, Weinstein's Evidence, § 103[02] (1988).

The "projection" upon which the damage award is based is clearly only plaintiff's own estimate and it has insufficient probative value to establish lost profits.

The Fifth Circuit has pointed out that even where timely objection is not made, the trial court has a duty to see to it that justice is done. See, *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233 (5th Cir.1985), where the court ordered the trial judge to grant a new trial as to the amount of damage even though the trial judge had declined to grant the new trial. This court finds itself in a position similar to that of Judge Beer in *Willett v. Western Oceanic, Inc.*, 117 F.R.D. 379 (E.D.La.1987) where he commented:

How does a district judge address these matters in an even handed way when he perceives the defendants mismanaged the presentation of their case, but still the award shocks the judicial conscience under the circumstances of the case. My conclusion is that the judge has to do his duty vis-a-vis the inappropriateness of the quantum award, all of the factors to the contrary notwithstanding.

117 F.R.D. at 382.

As Judge Russell commented in *Brownlee v. United Fidelity Life Ins. Co.*, 117 F.R.D. 383 (S.D.Miss.1987), aff'd, 854 F.2d 1319 (5th Cir.1988).

When determining if a new trial is required, the Court must separate the

damages and liability issues. *Edwards v. Sears, Roebuck & Company*, 512 F.2d 276 (5th Cir.1975). If it can be established that passion, prejudice, caprice, undue sympathy or arbitrariness tainted only the damage award and not the liability assessment, the proper response is a remittitur or a new trial addressed to damages alone ...

The propriety of an argument is a matter of federal trial procedure, *Byrd v. Blue Ridge Rural Electric Cooperative*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), and in a diversity case, subject to federal rather than state law. *Baron Tube Co. v. Transport Insurance Co.*, 365 F.2d 858 (5th Cir.1966) (en banc). Therefore, even if no objections were made by defense counsel, this Court has been advised that where the defendant's right to a fair trial has been prejudiced, the error must be corrected and a new trial provided. *Edwards*, 512 F.2d at 286.

117 F.R.D. at 385 (emphasis supplied).

It is elementary that jury verdicts on damages may be overturned only upon a clear showing of excessiveness or upon a showing that they were influenced by passion or prejudice. See, e.g. *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233 (5th Cir.1985); *Martin v. City of New Orleans*, 678 F.2d 1321 (5th Cir.1982) cert. denied, 459 U.S. 1203, 103 S.Ct. 1189, 75 L.Ed.2d 435 (1983); *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927 (5th Cir.1982).

This court is convinced that the verdict in this case is grossly excessive and is predicated upon inadmissible evidence, to which no objection was made. Under the circumstances, the court is convinced that a new trial limited to the issue of damages must be granted in the interest of justice.

For the foregoing reasons, the motion of defendants for a new trial is GRANTED as to the amount of damages and is DENIED in all other respects.

One matter remains and that is the question of when will interest begin to run upon the jury verdict. This court has previously held that interest runs from February 7, 1984, the date of the letter from the defendant, which constituted an anticipatory breach of the contract. Further research has convinced the court that that holding is in error. The damages in this case were not ascertainable as of the date of the anticipatory breach since they are "lost profits." Not one sale had been confected as of that date. All sales were to be completed at a point in time after that date. The court is well aware that the Louisiana intermediate appellate courts are not completely consistent on this issue. The Louisiana Supreme Court has spoken to this issue, however, in *Alexander v. Burroughs Corp.*, 359 So.2d 607 (La.1978). That case involved a redhibitory action and the court held that all of plaintiff's claims, except attorney's fees, were ascertainable on the date of formal demand for cancellation and thus interest ran from that date on all claims except attorney's fees; on that claim interest ran only from the date of the award. Here, as we have noted, plaintiff's claims for lost profits can not be ascertained until they are fixed by the trier of fact and interest under the jurisprudence should run either from date of judicial demand or from date of judgment. It is not completely clear which date should apply in this case and that is a matter that the parties must address prior to the new trial on the issue of damages.